UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
JOHN DOE,

                                          Civil Action No. 20-cv-04718-DG-PK

            Plaintiff,

      -against-

POLY PREP COUNTRY DAY SCHOOL,

            Defendant.
--------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION TO DISMISS

**LEWIS BAACH KAUFMANN MIDDLEMISS PLLC**

BY:    */s/ Jason H. Berland*
          Jason H. Berland
          Diane Camacho
          The Chrysler Building
          405 Lexington Avenue, 64th Floor
          New York, NY 10174
          Tel: (212) 826-7001
          Fax: (212) 826-7146
          jason.berland@lbkmlaw.com
          diane.camacho@lbkmlaw.com

          *Counsel for Plaintiff John Doe*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

ARGUMENT .................................................................................................................... 6

I.    THE CHILD VICTIMS ACT'S ONE-YEAR REVIVAL IS MANIFESTLY
      CONSTITUTIONAL ............................................................................................. 6

II.   THE FIRST AMENDED COMPLAINT SUFFICIENTLY ALLEGES THAT
      POLY HAD CONSTRUCTIVE NOTICE OF THE ABUSE. ......................... 13

      A.    The First Amended Complaint Adequately Alleges Constructive Notice ............ 13

      B.    In Any Event, Constructive Notice is Not Required to Establish Poly's
            Liability ................................................................................................................ 18

III.  THE FIRST AMENDED COMPLAINT SUFFICIENTLY STATES A CLAIM
      FOR BREACH OF DUTY *IN LOCO PARENTIS* AND BREACH OF
      FIDUCIARY DUTY .............................................................................................. 20

      A.    The First Amended Complaint Adequately States Poly's Breach of its
            Duty to Act *in loco parentis* by Failing to Properly Supervise Doe ................... 20

      B.    The First Amended Complaint Further Establishes Poly's Breach of the
            Fiduciary Duty Owed to its Students .................................................................. 23

IV.   THE FIRST AMENDED COMPLAINT ADEQUATELY ALLEGES CLAIMS
      FOR INADEQUATE SECURITY AND FOR BREACH OF POLY'S
      NONDELEGABLE DUTY ................................................................................... 25

V.    THE FIRST AMENDED COMPLAINT ADEQUATELY STATES CLAIMS
      FOR INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL
      DISTRESS .............................................................................................................. 29

      A.    Poly's willful and continued facilitation, tolerance, and coverup of
            rampant sexual abuse of minor students for decades by Poly staff
            constituted conduct "beyond all possible bounds of decency."" .......................... 29

      B.    Poly deliberately ignores the clear factual allegations detailing the
            physical manifestations of severe emotional distress in Doe's First
            Amended Complaint. ............................................................................................ 30

VI.   DOE'S CLAIMS ARE NOT IMPERMISSIBLY DUPLICATIVE ................ 31

VII.  POLY IS LIABLE FOR THE ASSAULT AND BATTERY COMMITTED BY
      ITS EMPLOYEE ................................................................................................... 33

CONCLUSION ............................................................................................................... 35

i

# <u>TABLE OF AUTHORITIES</u>

## CASES

**Page**

*164 Mulberry St. Corp. v. Columbia Univ.*,
 4 A.D.3d 49 (2004)..................................................................................................29

*A.B. v. Staropoli*,
 929 F.Supp.2d 266 (S.D.N.Y. 2013) ......................................................................17

*Aiena v. Olsen*,
 69 F. Supp. 2d 521 (S.D.N.Y. 1999) .......................................................................31

*Bevelacqua v. Brooklyn Law School*,
 No. 500175/2012, 2013 WL 4082674 (Sup. Ct. Kings Cty. Apr. 22, 2013)...........24

*Brenner v. Johnson Controls, Inc.*,
 277 A.D.2d 412 (2d Dep't 2000) ............................................................................28

*Cesar Ivan A. v. Lolita Child Day Care*,
 98 A.D.3d 697 (2d Dep't 2012) ..............................................................................23

*Charles v. Village of Mohawk*,
 128 A.D.3d 1477 (4th Dep't, 2015) ........................................................................23

*Chase Securities v. Donaldson*,
 325 U.S. 304 (1945) ..................................................................................................7

*Conte v. Servisair/Globeground*,
 63 A.D.3d 981 (2d Dep't 2009) ..............................................................................28

*Coon by Fontana v. Bd. of Educ. of City of New York*,
 160 A.D.2d 403 (1st Dep't 1990)............................................................................19

*Cruz v. New York City Tr. Auth.*,
 136 A.D.2d 196 (2d Dep't, 1988) ...........................................................................23

*David v. County of Suffolk*,
 1 N.Y.3d 525 (2003).................................................................................................22

*DeAngelis v. Am. Airlines, Inc.*,
 No. 06-CV-1967, 2010 WL 1292349 (E.D.N.Y. Mar. 31, 2010) ...........................15

*Deb B. v. Longwood Cent. Sch. Dist.*,
 165 A.D.3d 1212 (2018)...........................................................................................22

*Diamond Jewels v. Lewis*,
 No. 15-CV-5760, 2019 WL 5896224 (E.D.N.Y. Nov. 12, 2019) ...........................18

*Dinardo v. City of New York*,
 13 N.Y.3d 872 (2009)...............................................................................................21

*Doe v. City of New York*,
 No. 15-CV-0117(AJN), 2018 WL 6095847 (S.D.N.Y. Nov. 21, 2018) .................15

*Doe v. Rohan*,
  17 A.D.3d 509 (2d Dep't 2005) ................................................................17

*Doe v. Whitney*,
  8 A.D.3d 610 (2d Dep't 2004) ...............................................14, 19, 21

*Ellin v. Best Buy Stores, L.P.*,
  No. 1:16-CV-8855 (ALC), 2018 WL 1281814 (S.D.N.Y. Mar. 7, 2018)................................17

*Ferguson v. City of New York*,
  118 A.D.3d 849 (2d Dep't 2014) ...........................................................21, 33

*Gallewski v. Hentz and Co.*,
  301 N.Y. 164 (1950)................................................................................9

*Garcia v. City of New York*,
  222 A.D.2d 192 (1st Dep't 1996)........................................18, 19, 20

*Garzilli v. Howard Johnson's Motor Lodges, Inc.*,
  419 F.Supp. 1210 (E.D.N.Y. 1976) .................................................27

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1989) ...........................................................................17

*Ghaffari v. North Rockland Cent. School Dist.*,
  23 A.D.3d. 342 (2d Dep't 2005) ......................................................17

*Giuffre v. Dershowitz*,
  No. 19 Civ. 3377 (LAP), 2020 WL 2123214 (S.D.N.Y. Apr. 8, 2020) ..................................7, 8

*Gomez-Jimenez v. New York Law School*,
  103 A.D.3d 13 (1st Dep't 2012) ......................................................24

*Gordon v. American Museum of Natural History*,
  67 N.Y.2d 836 (1986)........................................................................16

*Guggenheimer v. Ginzburg*,
  43 N.Y.2d 268 (1977)........................................................................29

*Harmon v. Diocese of Albany*,
  N.Y. Slip Op. 50005(U) (Sup. Ct. Albany Cnty. 2021) .....................18, 19, 20, 21

*Howell v. New York Post Co.*,
  81 N.Y.2d 115 (1993)..................................................................30, 31

*Hymowitz v. Eli Lilly & Co.*,
  73 N.Y.2d 487 (1989)................................................................9, 11

*Irons v. Inst. for Cmty. Living, Inc.*,
  No. 17-CV-7052, 2019 WL 121675 (E.D.N.Y. Jan. 7, 2019)................................26

*Jacqueline S. v. City of New York*,
  81 N.Y.2d 288 (1993)........................................................................27

*JG v. Goldfinger*,
  161 A.D.3d 640 (1st Dep't 2018)....................................................26

*Johansmeyer v. New York City Dep't of Educ.*,
165 A.D.3d 634 (2d Dep't 2018) .......................................................14

*Jones v. State of New York*,
33 N.Y.2d 275 (1973).......................................................33

*Judith M. v. Sisters of Charity Hosp.*,
93 N.Y.2d 932 (1999).......................................................33

*Kahane v. Marriott Hotel Corp.*,
249 A.D.2d 164 (1st Dep't 1998) .......................................................26

*Karim v. 89th Jamaica Realty Co., L.P.*,
127 A.D.3d 1030 (2d Dep't 2015) .......................................................26

*Keenan v. Dayton Beach Park No. 1 Corp.*,
175 A.D.2d 862 (2d Dep't 1991) .......................................................27

*Kelleher v. F.M.E. Auto Leasing Corp.*,
192 A.D.2d 581 (2d Dep't 1993) .......................................................34

*Koran I. v. New York City Bd. of Educ.*,
256 A.D.2d 189 (1st Dep't 1998).......................................................17

*Kukla v. Syfus Leasing Corp.*,
928 F.Supp. 1328 (S.D.N.Y. 1996) .......................................................27

*Leon v. Martinez*,
84 N.Y.2d 83 (1994).......................................................29

*Logan v. City of New York*,
148 A.D.2d 167 (1st Dep't 1989).......................................................14, 15

*Mathis v. Board of Educ. of City of N.Y.*,
126 A.D.3d 951 (2015).......................................................33

*Matter of McCann v. Walsh Constr. Co.*,
282 A.D. 444 (3d Dep't 1953) .......................................................9, 10

*Matter of World Trade Ctr. Lower Manhattan Disaster Site Litigation*,
30 N.Y.3d 377 (2017).......................................................7, 8, 10

*Mirand v. City of New York*,
84 N.Y.2d 44 (1994).......................................................21, 22

*Moy v. Adelphi Institute, Inc.*,
866 F. Supp. 696 (E.D.N.Y. 1994).......................................................24

*Murphy v. Home Prod. Corp.*,
58 N.Y.2d 293 (1983).......................................................14, 30

*Murray v. Rsch. Found. of State Univ. of New York*,
184 Misc.2d 453 (Sup. Ct. Monroe Cnty. 2000).......................................................14, 18, 22

*Nallan v. Helmsley–Spear, Inc.*,
50 N.Y.2d 507 (1980).......................................................26

*Ortiz v. New York City Hous. Auth.*,
   22 F.Supp.2d 15 (E.D.N.Y. 1998)................................................................26

*Pantages v. L.G. Airport Hotel Assoc., Inc.*,
   187 A.D.2d 273 (1st Dep't 1992)................................................................27

*PB-36 Doe v. Niagara Falls City Sch. Dist.*,
   No. E172556/2020, 2021 WL 3044998 (N.Y. Sup. Ct. Niagara Cnty. July 19, 2021)....... 25-26

*Penato v. George*,
   52 A.D.2d 939 (2d Dep't 1976) ................................................................24

*Phillips ex rel. Green v. City of New York*,
   453 F.Supp.2d 690 (S.D.N.Y. 2006) ..........................................................20

*Pinks v. Turnbull*,
   No. 25 Misc.3d 1245(A) (Sup. Ct. 2009).................................................29, 32

*Pratt v. Robinson*,
   39 N.Y.2d 554 (1976)..............................................................................21

*R.B. Dev., Co., Ltd. v. Tutis Capital LLC*,
   No. 12-CV-01460 (CBA) (SMG), 2013 WL 12358006 (E.D.N.Y. Sept. 27, 2013)................31

*Rahim v. Sottile Sec. Co.*,
   32 A.D.3d 77 (1st Dep't 2006)................................................................28

*Rivera v. State*,
   34 N.Y.3d 383 (2019)..............................................................................33

*Riviello v. Waldron*,
   47 N.Y.2d 297 (1979)..............................................................................33

*Robinson v. Robins Dry Dock & Repair Co.*,
   238 N.Y. 271 (1924)................................................................................9

*Rotz v. City of New York*,
   143 A.D.2d 301 (1st Dep't 1988)..............................................................27

*Sawyer v. Wight*,
   196 F.Supp.2d 220 (E.D.N.Y. 2002)..........................................................26

*Scollar v. City of New York*,
   160 A.D.3d 140 (1st Dep't 2018)..............................................................29

*Sherman v. State Department of Public Safety*,
   190 A.3d 148 (Del. 2018)........................................................................34

*Speigh v. City of New York*,
   309 A.D.2d 501 (1st Dep't 2003)..............................................................15

*Splawn v. Lextaj Corp.*,
   197 A.D.2d 479 (1st Dep't 1993)..............................................................27

*Sprung v. Command Sec. Corp.*,
   38 A.D.3d 478 (1st Dep't 2007)................................................................28

*Stinson v. Roosevelt U.F.S.D.*,
  61 A.D.3d 847 (2d Dep't 2009) ..............................................................21

*T.Z. v. City of New York*,
  635 F.Supp.2d 152 (E.D.N.Y. 2009) .................................19, 21, 22, 23

*Taft v. Connell*,
  285 A.D.2d 992 (4th Dep't 2001) ..........................................................26

*Taylor v. Manheim Mktg. Inc.*,
  No. 15-CV-01950, 2017 WL 5905544 (E.D.N.Y. Nov. 30, 2017), ......................................15

*Tesoriero v. Syosset Cent. Sch. Dist.*,
  382 F.Supp.2d 387 (E.D.N.Y. 2005) ...............................19, 21, 22

*Timothy Mc. v. Beacon City Sch. Dist.*,
  127 A.D.3d 826 (2d Dep't 2015) ...........................................................22

*Wayne S. v. Nassau County, Dep't of Social Services*,
  83 A.D.2d 628 (2d Dep't 1981) ............................................................29

*Willis v. YMCA of Amsterdam*,
  28 N.Y.2d 375 (1971) ...........................................................................23

*Zimmerman v. Poly Prep Country Day Sch.*,
  888 F. Supp. 2d 317 (E.D.N.Y. 2012) ..................................................24

*Zumpano v. Quinn*,
  6 N.Y.3d 666 (2006) .............................................................................12

## STATUTES

CPLR 214-g ............................................................................. passim

NY LEGIS 130 (2020), 2020 Sess. Law News of N.Y. Ch. 130 (S. 7082) (McKinney) ..............15

## RULES

Fed. R. Civ. P. 8 ......................................................................................31

## OTHER AUTHORITY

Alexander, Vincent C., *Practice Commentaries*, McKinney's CPLR § 214-g ........................8, 12

Plaintiff John Doe ("Doe"), by and through his undersigned attorneys, respectfully submits this Memorandum of Law in Opposition to Defendant Poly Prep Country Day School's ("Poly") Motion to Dismiss.

## PRELIMINARY STATEMENT

This is a revival action brought pursuant to the New York Child Victims Act (the "CVA"), CPLR § 214-g, which opened a historic one-year time window for victims and survivors of childhood sexual abuse in the State of New York to pursue lapsed claims.[1] As a student at Poly in the 1970s, Doe was sexually abused on multiple occasions by a Poly teacher, who was one of many who preyed on children, which Poly knew about and responded with inaction and threats.

Poly seeks to be dismissed from this action on a variety of meritless grounds, ranging from an unsustainably obtuse misinterpretation of the law regarding negligence liability to a frivolous constitutional challenge. Poly spends much of its motion seeking to invent out of whole cloth a New York constitutional right to avoid the sexual abuse claims of minor children in the face of clear and justified legislative action and intent to the contrary. Notably, CVA actions were specifically invited by the New York Court of Appeals as a way to prevent the decades-long injustice that required victims to come forward when victims were young, and the psychological and scientific realities posed great obstacles to doing so. Poly submits that the rights of sexual abuse victims should be ignored in favor of Poly's purported constitutional entitlement to repose for its inexcusable failure to protect the children in its care from sexual predation over many years. Not a single New York case remotely supports Poly's position.

---

[1] The one-year window was extended for an additional year due to the COVID-19 pandemic. NY LEGIS 130 (2020), 2020 Sess. Law News of N.Y. Ch. 130 (S. 7082) (McKinney).

Poly knew about predatory pedophiles on its faculty beginning in the 1960s. Rather than take action, Poly instead worked to silence the victims through threats against students and parents. Poly now argues that its rights are violated because it must face accountability through multiple lawsuits from multiple victims against multiple faculty members for a period of abuse that spans at least two decades. Poly is not a victim here; it is only unfortunate that the true victims had to wait so many years for New York to enact the CVA. For decades, Poly maintained a culture of impunity for child sexual abusers, in which Poly purposefully failed to take any action to perform due diligence, train or monitor its staff, question or honestly investigate complaints.

Now Poly once again seeks to take advantage of a culture of secrecy, shame, humiliation and retaliation. It seeks to shame Plaintiff yet again by compelling public disclosure of his identity in this action. It also claims it cannot be liable because Plaintiff in this action cannot show on a motion to dismiss—before any discovery has been taken—that Poly had specific knowledge that this specific teacher was also molesting children.

Poly's motion to dismiss mischaracterizes the allegations of the First Amended Complaint ("FAC") and misstates the law. Once again, it tries to play hardball with victims. Plaintiff has stated valid claims against Poly for lifelong damages stemming from the sexual assault he suffered as child while attending Poly. This Court should deny Poly's motion in its entirety.

## **FACTUAL BACKGROUND**

From approximately 1974 to 1976, Doe was a victim of sexual abuse by John Miller ("Miller"), a long-time humanities, Bible and Latin teacher at Poly, who was also an ordained Episcopal priest. FAC ¶ 10. Doe was also a member of the football team coached by the notorious serial predatory pedophile Philip Foglietta ("Foglietta"). *Id.* Poly refuses to countenance the interrelationship between Doe's abuse by Miller and Doe's mistreatment by Foglietta, seeking to

2

strike these allegations. As Poly well knows and fears, the environment of cruel indifference to abuse, and the boys' knowledge that they were powerless to stop it, is integral to Doe's story and the story of so many other damaged boys. Cruelty, fear, shaming and grooming were endemic at Poly and essential to the culture of rampant sexual abuse that harmed so many children over so many years. Poly's attempt to rip Doe's abuse out of context is a baseless tactic to prevent Doe from having an opportunity to tell his truth to the trier of fact in this action.

Doe was best friends with another member of the football team who had witnessed sexual activity by Foglietta against a child on the Poly campus, had reported Foglietta's behavior to the Poly headmaster, and whose parents complained to the Poly administration. *Id.* ¶ 11. Foglietta knew he had been reported by Doe's best friend; that the headmaster was ignoring this and other credible reports; and that Doe and the victim were close friends. *Id.* As a result, Foglietta targeted and subjected Doe to unceasingly aggressive retribution. *Id.*

On at least two occasions, Doe also witnessed Foglietta sexually abusing children in his office. *Id.* ¶ 12. Doe also saw Foglietta taking one boy to the dirt floor gym and lock the door, and Doe and others well understood Foglietta was abusing the boy. *Id.* ¶ 14. Doe also saw boys in Foglietta's office in the locker room area, which was known as "the cage." *Id.* He knew that Foglietta also showered in the nude with boys as young as 10 years old in the lower school shower room. *Id.* Foglietta not only was preying on children but was making no real effort to hide it. *Id.* ¶ 12. Boys discussed Foglietta's behavior openly.  Doe was angry and shocked that the sexual abuse was effectively in plain sight, and that no one in a position of authority was doing anything about it. *Id.* ¶ 12. He was disgusted and frightened that such behavior was so clearly tolerated and that many boys were so obviously at risk. *Id.* ¶ 12. Doe also knew that other coaches, as well as the dean of students and director of athletics, were all aware that Foglietta was sexually preying on

students, had walked in on such activity, and were covering up for him. *Id.* ¶ 15. Doe believed that because Foglietta was a successful football coach with an intimidating presence, no one in the school would take any action to stop this behavior. *Id.* Doe was miserable that he was stuck and powerless in this environment.

In his junior year of high school, Doe enrolled in a course taught by Miller. *Id.* ¶ 20. Miller was highly eccentric, emotional and stood out among the Poly faculty as a loner. *Id.* But, he was the first teacher at Poly who gave positive feedback to Doe as a student, reacted positively to Doe's comments in class and gave him good grades on his papers. *Id.* ¶ 21. Miller told Doe that he viewed him as having great insights and a "true soul." *Id.* ¶ 21. He also referred to Doe in front of the entire class as a "[…] god," with the bracketed material referring to Doe's ethnicity. This was perhaps meant to be a compliment on Doe's looks, but was strange and embarrassing, as it was in front of other boys in the class who teased him about it.[2] Miller made other bizarre and personal remarks about boys' appearances and characters.

During the first trimester of junior year, while school was fully in session, Miller asked Doe to stay after class. *Id.* ¶ 22. Miller trapped Doe in the back corner of the room and held him and pressed up against his torso and genitals. *Id.* Miller's classroom had a wall of windows without any coverings and abutted a large study hall, so students and teachers in the study hall had a clear view into Miller's classroom, including where Miller was assaulting Doe. *Id.* The study hall was a high-traffic area, and one of the largest and most-used spaces in the school, where students and faculty came and went throughout the day. *Id.* Knowing that Miller's classroom was clearly visible

---

[2] This was not specifically pleaded in the FAC, which requires notice pleading only, because it is evidence and the was viewed as perhaps providing clues to Doe's identity. Nevertheless, given that Poly has stated in its opposition that there could have been no way that anyone at Poly could or should have known, this reference, among others that Miller made about Doe and others, will be seen as evidence at trial of his strange and over-familiar references to boys' appearances.

from the study hall, Doe began to cry; he was terrified that other students or Poly staff would see him and mock him endlessly. *Id.* Miller kissed Doe and began licking Doe's tears, further intensifying Doe's fear that he would be humiliated in front of his peers and adults at Poly. *Id.*

Doe recalls another incident in his junior year when he and Miller were sitting alone together in the cafeteria during lunch time. *Id.* ¶ 24. The cafeteria was crowded with other students and faculty at other tables. *Id.* An English teacher sat down at a table directly across from Doe and Miller and immediately rolled his eyes and shook his head, signaling his recognition that Miller was grooming Doe and had taken an inappropriate interest in the child. *Id.* Yet, despite the apparent knowledge of this teacher and others at Poly of the inappropriate interest Miller had taken in Doe, nothing was done. And throughout Doe's junior year and into his senior year, there were approximately five or six further groping incidents in Miller's classroom visible to the study hall. *Id.* ¶¶ 23, 25.

Doe was conflicted because he greatly appreciated the interest that Miller took in him when no other teacher had done so, but he had no interest in sexual contact with Miller. *Id.* He was just a teenager at the time of the abuse, and was filled with confusion, anxiety and self-loathing. *Id.* He had suicidal thoughts at this time and during the next two years because he was overwhelmed with these painful feelings. *Id.* Nevertheless, with few other choices due to his academic record, Doe was still forced to ask Miller for a recommendation for college. *Id.* ¶ 26. Miller agreed and invited Doe to the Yale Club for lunch to discuss his college plans. *Id.* After lunch, Miller invited Doe to visit his apartment on upper Park Avenue. *Id.* At the apartment, Miller made aggressive advances and tried to have oral sex with Doe, stating that sex between them would be an activity of spirituality and religiosity. *Id.* ¶ 27. Doe declined, made excuses and left the apartment. *Id.* He was extremely disturbed by the incident. *Id.*

Doe was 15 when these incidents began and 17 at the time of the incident at Miller's apartment. *Id.* ¶ 28. As is so often the case with sexual abuse, his feelings of guilt, humiliation and powerlessness led him to repress these powerful memories. *Id.* It was his painful, awful, ever-present secret. *Id.* He grappled with shame and confusion; he questioned his sexuality; he was haunted by the fact that the first person who ever kissed him was Miller. *Id.* For years, Doe was hyper-protective of his children, would not allow them to engage in many activities, have sleepovers, or go to camp, and would not put them in situations where they were alone with adults when he was not there. *Id.* ¶ 30. He has had difficulty in sustaining a career and has had financial and professional challenges throughout his life. *Id.*

Doe was traumatized by the culture of knowing tolerance of sexual abuse at Poly and Miller's taking advantage of him after serving as the one person who gave him encouragement and recognition. *Id.* ¶ 31. He remains enraged, shamed, distracted and damaged by what he endured. *Id.* He was not surprised to learn that other students have come forward regarding similar abuse by multiple other teachers and coaches as well. Now, Doe has been granted a remedy for the trauma that has hung over his life for decades.

## ARGUMENT

### I.  THE CHILD VICTIMS ACT'S ONE-YEAR REVIVAL IS MANIFESTLY CONSTITUTIONAL.

Poly's argument that the CVA's one-year window for previously untimely civil actions exceeds the Legislature's authority and violates the New York State Constitution is unsupported makeweight. There is no constitutional protection against claims for child sexual abuse. Rather, the CVA reflects enlightened legislative reaction to clear signals by the Court of Appeals as to the proper way to remedy a manifest injustice.

Poly's argument depends on the notion that it has a protectible due process right to repose from sexual abuse claims that somehow trumps the rights of victims and the legislative judgment underlying the CVA. Not a single case remotely supports such a position. Poly essentially contends that *every* case addressing the issue, each of which contradicts Poly's position, is wrongly decided. The argument is risible.

Reviving a time-barred claim by extending the relevant limitations period has long been held valid under the Fourteenth Amendment to the United States Constitution. *Chase Securities v. Donaldson*, 325 U.S. 304, 311-12 (1945). The gravamen of Poly's claim, however, is that the CVA's revival provision does not comport with the New York State Constitution, without a single shred of support. The New York Court of Appeals has *never* held a claim revival statute unconstitutional, and four years ago, in *Matter of World Trade Center Lower Manhattan Disaster Site Litigation*, 30 N.Y.3d 377 (2017), it specifically declared civil revival provisions like that of the CVA consistent with both the Fourteenth Amendment *and* the New York State Constitution. In that case, the Court ruled that "a claim-revival statute will satisfy the Due Process Clause of the State Constitution if it was enacted as a reasonable response in order to remedy an injustice." 30 N.Y.3d at 400. The Court refused to restrict the Legislature's power to revive civil suits, holding:

> A more heightened standard would be too strict. In the context of a claim-revival statute, there is no principled way for a court to test whether a particular injustice is "serious" or whether a particular class of plaintiff is blameless; such moral determinations are left to the elected branches of government.

*Id.* Thus, such claim-revival measures "come to the Court with a presumption of constitutionality" so long as "the revival statute was a reasonable measure to address an injustice." *Id.*

Poly then erroneously contends that recent, consistent trial-level decisions upholding the constitutionality of the CVA, in both New York state and federal district courts, were wrongly decided. One such case referenced by Poly is *Giuffre v. Dershowitz*, No. 19 Civ. 3377 (LAP), 2020

WL 2123214, at *2 (S.D.N.Y. Apr. 8, 2020), which noted that "the New York Courts' historical skepticism of claim-revival provisions appears to be just that: historical. While Justice Cardozo may have opined that claim revival is an extreme exercise of legislative power nearly a century ago, that does not appear to be the prevailing view of such provisions in the here and now." (Internal citation and quotation omitted). The court went on to note that "the New York Court of Appeals has recently enunciated the permissive stance that a given revival statute will not run afoul of New York's due process clause if it merely 'was a reasonable measure to address an injustice.'" *Id.* (citing *Matter of World Trade Ctr.,* 30 N.Y.3d at 400).

This controlling language from New York's highest court leaves no doubt as to the legitimacy of the window at issue here. In accord with the holding in *Matter of World Trade Center*, the Sponsor's Memorandum for the CVA spells out precisely the "injustice" the CVA was designed to remedy and explains why the CVA's one-year revival window is "a reasonable measure to address" that injustice:

> New York is one of the worst states in the nation for survivors of child sexual abuse. New York currently requires most survivors to file civil actions or criminal charges against their abusers by the age of 23 at most, long before most survivors report or come to terms with their abuse, which has been estimated to be as high as 52 years old on average. Because of these restrictive statutes of limitations, thousands of survivors are unable to sue or press charges against their abusers, who remain hidden from law enforcement and pose a persistent threat to public safety.
> …
> Passage of the Child Victims Act *will finally allow justice for past and future survivors of child sexual abuse, help the public identify hidden child predators through civil litigation discovery, and shift the significant and lasting costs of child sexual abuse to the responsible parties.*

Vincent C. Alexander, *Practice Commentaries*, McKinney's CPLR § 214-g (quoting Sponsor's Memorandum to Chapter 11 of the Laws of 2019) (emphasis added). New York's Legislature thus identified the injustice—the fact that the old statutes of limitation for child sexual abuse expired long before most victims could "come to terms" with what they had suffered—and established a

clearly reasonable remedy by opening a window for one year. Poly seems to take the view that "justice for past and future survivors of sexual abuse," "helping the public identify hidden child predators" through discovery and shifting the "significant and lasting costs of child sexual abuse to the responsible parties" are somehow patently fallacious policy judgments that deserve no respect as a "reasonable measure to remedy injustice." The argument is fantastical and repulsive.

The Legislature's revival of claims under CPLR § 214-g for historic child sexual abuse is a reasonable, justified and wise response to a manifest injustice: a short, limited revival, enacted to remedy the previous inability of thousands of child sex abuse survivors to bring timely actions because of their inhibiting and psychological scars that, as a matter of objective reality and science, they would not have brought within the unjustly brief period that the Legislature found to have been "long before most survivors report or come to terms with their abuse." Somehow Poly conveniently takes issue with this legislative judgment, which has allowed Doe and numerous others to demand the accountability and respect denied to them for so many decades.

Even the cases where Poly has cherry-picked language are fatal to its position. As a threshold matter, *none* of them dealt with sexual abuse and *all* of them permitted revival. In *Matter of World Trade Center*, the Court of Appeals canvassed the same prior New York cases cited by Poly that addressed the standard of review governing the merits of a New York State Due Process Clause challenge to a claim-revival statute. 30 N.Y.3d at 381. Every one of them upheld the claim-revival statute. *See Robinson v. Robins Dry Dock & Repair Co.,* 238 N.Y. 271 (1924); *Gallewski v. Hentz and Co.*, 301 N.Y. 164 (1950); *Matter of McCann v. Walsh Constr. Co.,* 282 A.D. 444 (3d Dep't 1953); and *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487 (1989). After considering these cases, the Court of Appeals then summarized the jurisprudence of claim revival as follows:

> The salient facts in each of *Robinson*, *Gallewski*, *McCann* and *Hymowitz* fall into the same pattern. *First, there existed an identifiable injustice that moved the*

*legislature to act.* In *Robinson*, it was the plaintiffs' exclusive reliance on a provision of the workers' compensation law that was struck down by the United States Supreme Court (*see* 238 N.Y. at 279); in *Gallewski*, it was the occupation of the plaintiffs' countries of residence during World War II (*see* 301 N.Y. at 175); and in *Hymowitz* and *McCann*, it was latent injuries caused by harmful exposure, which the plaintiffs were not able to attribute to an action or omission of the defendant until the statutory period to bring a claim had already expired (*see Hymowitz*, 73 N.Y.2d at 514-515; *McCann*, 282 A.D. at 445-446). *Second, in each case, the legislature's revival of the plaintiff's claims for a limited period of time was reasonable in light of that injustice.*

*Matter of World Trade Ctr.*, 30 N.Y.3d at 399–400 (emphasis added).

In *Matter of McCann,* cited by Poly, the Appellate Division affirmed the constitutionality of civil claim revival for claimants suffering from a disease of which they might not have been aware before the original statute of limitations expired:

> As the Legislature recognized, in the case of a disease of an insidious character, the effects of which might be latent or long delayed, the right to compensation might be barred by the operation of the Statute of Limitations even before the claimant was aware of the fact that he had the disease. In these circumstances, the Legislature did no more than to comply with the simple demands of justice in relieving innocent claimants of the effect of the statutory time limitations which would otherwise bar their right to compensation.

*McCann*, 282 A.D. at 450. The Appellate Division said nothing about such a revival being an "extraordinary remedy," only that it met "the simple demands of justice." And it is obvious from the Sponsor's Memorandum that the Legislature regarded child abuse as akin to a "disease . . . the effects of which might be latent or long delayed," as in *McCann*, such that claim revival is as justified for child sex abuse victims as for the victims of any other "disease of an insidious character." Poly suggests that victims should have somehow known all about their claim by the time they turned 23, and that the psychological repression or inhibition that they have suffered is somehow different from a latent disease claim. This position ignores the specific legislative judgment to the contrary, modern scientific knowledge and the consensus of public policy, and is fundamentally unworthy of an institution that purports to be committed to knowledge and truth.

10

Yet another case cited by Poly, far from supporting its position, shatters its insistence that claim revivals are never available to plaintiffs who, as Poly sees it, could have possibly brought an action in a timely manner even without a temporary claim revival. In *Hymowitz,* the Court of Appeals upheld a civil claim revival in the context of injuries (in that case, from exposure to a chemical) that might fully manifest at different times in different victims:

> It does seem that some plaintiffs may have known of their injuries a day, or a week, a month, or perhaps longer, before the original limitations period ran.... Under these circumstances, the Legislature properly determined that it would be more fair for all plaintiffs to uniformly now have one year to bring their actions, rather than for the courts to begin drawing arbitrary lines transecting this area's shades of gray.

*Hymowitz*, 73 N.Y.2d at 515.

The Court of Appeals thus rejected Poly's argument that no plaintiff who may have had a previous theoretical chance to file a civil action (before their 23rd birthdays) can benefit from the revival period. The Legislature is entitled to impose a prudential and uniform standard rather than have a case-by-case analysis of what each victim might have known on any particular date. Yet, Poly breathtakingly misrepresents this liberal ruling as one limited to matters where it would have been logistically impossible for a plaintiff to have brought an action in a timely manner. That is not what *Hymowitz* or any other New York case stands for.

In fact, the revival provisions of the CVA represent a classic application of principles repeatedly upheld by New York courts. The CVA is a carefully designed response to an obvious injustice, one in which victims like the Plaintiff—no differently from people suffering from insidious, long-dormant diseases—have lost their chance for justice due to circumstances that made it unjust to force abuse victims to bring their claims at a time when the Legislature judged it "long before they could come to terms" with their abuse. Moreover, the provisions serve to protect potential victims and to benefit New York society as a whole. Poly rebuts absolutely none of this.

Poly fares no better when it cites *Zumpano v. Quinn*, 6 N.Y.3d 666 (2006), and argues that the holding in that case has been misused by CVA plaintiffs because it predated the passage of the CVA. Once again, Poly has distorted New York law beyond recognition. *Zumpano* involved a sexual abuse suit against clergymen where the victims sought an equitable tolling of the applicable statute of limitations. *Id*. at 673–75. *Zumpano* considers the problem of premature limitation of claims of sexual abuse victims, indicates great empathy, but finds as a matter of institutional competence that such a judgment fundamentally belongs to the legislature, not the judiciary.

The Court of Appeals in *Zumpano* effectively sent a clear message to the New York Legislature that it saw an injustice that was not within its institutional competence, but rather up to the Legislature to enact a statute like the Child Victims Act:

> [H]owever reprehensible the conduct alleged, these actions are subject to the time limits created by the Legislature. Any exception to be made to allow these types of claims to proceed outside of the applicable statutes of limitations would be for the Legislature, as other states have done.

*Id*. at 677. Indeed, the Sponsor's Memorandum for the CVA specifically referred to the Court of Appeals' holding in *Zumpano* as part of the basis for legislation and noted that "[t]he societal plague of sexual abuse against minors is . . . well documented, as is the fact that the crimes of many abusers have been covered up by the institutions that employed them." Vincent C. Alexander, *Practice Commentaries*, McKinney's CPLR § 214-g (quoting Sponsor's Memorandum to Chapter 11 of the Laws of 2019, *supra*). Poly ignores the Legislature's direct reference to *Zumpano* when enacting the CVA—simply because it is incompatible with Poly's uniformly rejected position. Indeed, *Zumpano* was the genesis of a dialogue between branches that resulted in the CVA, a historical fact which Poly ignores simply because it is incompatible with Poly's uniformly rejected position. Instead, Poly puts forward the nonsensical argument that the Court of Appeals somehow failed to consider whether an extension of limitations passed constitutional

muster, suggesting that the Court of Appeals would invite the Legislature to take an unconstitutional action, and then, when the invitation became validly-enacted law, strike it down as unconstitutional.

The claim-revival provision of the CVA was inarguably a reasonable response to remedy an injustice clearly identified and articulated by the Legislature post-*Zumpano*. Poly has articulated no coherent due process right to avoid sexual abuse claims; its claims of evidentiary obstacles or fading memories affect both plaintiffs and defendants and would be the same in any revival action or, indeed, in any cause of action with a long limitations period. Poly's "right of repose" does not rise to constitutional moment and is of no gravity whatsoever when weighed against a right to remedy child sexual abuse. The CVA claim revival does not raise any New York State constitutional issue and Poly's motion to dismiss on this count should be denied.

## II.   THE FIRST AMENDED COMPLAINT SUFFICIENTLY ALLEGES THAT POLY HAD CONSTRUCTIVE NOTICE OF THE ABUSE

### A.  The First Amended Complaint Adequately Alleges Constructive Notice

The allegations in the FAC sufficiently allege that Poly at a minimum had constructive notice of Miller's abusive conduct towards Doe. Doe alleges that the abuse occurred in an open classroom during the school day, on school grounds, visible through windows to the largest academic room in the school, where there was a significant risk of being seen by others at any time, and that the abuse occurred on multiple occasions over the course of several years. The abuse furthermore occurred against the backdrop of rampant, reported sexual abuse of students on campus by other faculty and staff, which Poly knew of and was actively covering up. Such allegations sufficiently establish that Poly was on constructive notice of the abuse.

New York courts have charged schools with constructive notice of their employees' propensity to engage in harmful or abusive conduct towards students where there were "time

periods when the infant plaintiff was alone with [defendant] during school hours on a regular basis," and when "[d]uring these times, [defendant] engaged in inappropriate behavior, including physical touching." *Johansmeyer v. New York City Dep't of Educ.*, 165 A.D.3d 634, 636 (2d Dep't 2018) (affirming denial of defendant-employer's motion for summary judgment, finding various instances of inappropriate conduct at the school created a triable issue of fact regarding whether defendant school knew *or should have known* of its employee's propensity for sexual abuse) (citing *Doe v. Whitney*, 8 A.D.3d 610 (2d Dep't 2004)).

In *Murray v. Rsch. Found. of State Univ. of New York*, 184 Misc.2d 453, 457–58 (Sup. Ct. Monroe Cnty. 2000), *aff'd* 283 A.D.2d 995 (4th Dep't 2001), the trial court held that there was a triable issue of fact on constructive notice based on the plaintiff's allegations that she was excused from class on multiple occasions to meet with her assailant behind closed doors over a period of several months, during which times she was abused. Likewise, in *Logan v. City of New York*, 148 A.D.2d 167, 171–72 (1st Dep't 1989), the Appellate Division affirmed a trial court's denial of a defendant-school's motion for summary judgment in a case involving a student who was raped in a stairway at the school building. In that case, the school argued that it could not be held liable for negligent supervision because it did not have notice of the assailant's propensity to commit such acts and no previous similar incidents had been reported. The Appellate Division flatly rejected this argument, stating that because the school was aware that an attack in a stairway was possible, there was a triable issue of constructive notice of the risk of harm. *Id.* at 172.

Thus, while Poly insists that it cannot be held liable because, it claims, it did not specifically know *Miller* sexually abused children, that is not the end of the inquiry under New York law.  The FAC clearly sets forth factual allegations that the abuse took place over the course of several years and occurred on multiple occasions, virtually all during the school day and on school grounds. *See*

FAC ¶¶ 22, 23, 25. This was in a high-traffic area of a busy school building, in a room with a full wall of windows which would have allowed any passers-by to see what was happening. *Id.* ¶¶ 22, 25. As noted above, similar allegations have been held sufficient to create a triable issue of fact for purposes of a motion for summary judgment, and thus are certainly sufficient to create a prima facie allegation of Poly's constructive notice of the abuse for purposes of a motion to dismiss.

Poly also contends that a "general awareness" that a dangerous condition may be present is insufficient to demonstrate constructive notice, citing *DeAngelis v. Am. Airlines, Inc.*, No. 06-CV-1967, 2010 WL 1292349, at *6 (E.D.N.Y. Mar. 31, 2010).[3] This contention is misplaced; Doe's allegations go beyond mere "awareness," and instead assert that *Poly itself* manufactured the "dangerous condition" here. Despite Poly's assertion that a school's culture of child sexual abuse is immaterial for purposes of establishing whether it had constructive notice of precisely such conduct, there is relevant and persuasive authority to the contrary. For example, in *Doe v. City of New York*, No. 15-CV-0117(AJN), 2018 WL 6095847, at *4 (S.D.N.Y. Nov. 21, 2018), the court denied the defendant-employer's motion for summary judgment, finding that "a reasonable juror could conclude that the failures to investigate and discipline [employees] accused of sexual assault . . . caused [other employees] to determine that they would not be investigated or punished for participating in the sexual assault of [the plaintiff]." *Id. See also Logan*, 148 A.D.2d at 172; *Speigh v. City of New York*, 309 A.D.2d 501, 502 (1st Dep't 2003) (school may have had constructive notice of risk to students despite not knowing of propensity of specific assailant, since it knew that the school community included violent, predatory individuals).

---

[3] Poly additionally cites *Taylor v. Manheim Mktg. Inc.*, No. 15-CV-01950, 2017 WL 5905544, at *4 (E.D.N.Y. Nov. 30, 2017), *aff'd sub nom. Taylor v. Manheim Remarketing, Inc.*, 752 F. App'x 94 (2d Cir. 2019), for this same proposition, but full context of the court's analysis is illuminating. There, the court explained that "[a]bsent a showing that the defendant created the dangerous condition, the plaintiff must demonstrate either actual or constructive notice of the condition as an element of a prima facie negligence claim." *Id.* This directly supports a key premise of Doe's position: Poly did not just allow, but *created* a culture of sexual abuse within its walls, by protecting abusers and punishing victims who dared to speak out about their experiences.

New York law does *not* require that Poly was *specifically* aware of the propensity of Miller to sexually abuse children in order for its liability to arise, and constructive notice can be found where the facts allege, as here, that the defendant was aware of the risk of harm. The FAC alleges that Poly was aware that sexual abuse occurring on campus, as it was observed by other teachers and faculty members and even reported to the headmaster. *See* FAC ¶¶ 11, 12, 15, 24. The FAC further alleges that, not only did Poly fail to address this issue, but it also chose to threaten the minor victims in order to silence them from reporting their abuse. *Id.* ¶ 11. Doe further asserts that his own abuse took place in open, visible, high-traffic, and heavily populated areas of the school, and thus could and would have been discovered by Poly had it attempted even the slightest due diligence to keep its students safe from the predators on its payroll. *Id.* ¶ 22–25. And of course Poly had a track record of willful blindness to sexual abuse and a policy of taking action against complainants rather than predators. Poly seeks here to have its ostrich strategy rewarded with dismissal of the case.

The cases relied on by Poly to escape its liability for the harm caused by its employee are inapposite. The "seminal case" that Poly cites as the foundation for its argument is *Gordon v. American Museum of Natural History*, 67 N.Y.2d 836, 837 (1986), which involves a personal injury claim brought by a plaintiff who slipped on a piece of wax paper that had temporarily fallen onto the museum steps. Not knowing someone had dropped a piece of paper at a particular moment is, to say the least, quite different from claiming not to know that sexual abuse that went on for a period of years in plain sight is grounds for dismissal on constructive notice grounds. The same fundamental irrelevance is found in virtually all of the cases cited by Poly to support its argument

16

for dismissal, as none of these cases involved anything approaching the culture of impunity and obdurate refusal to take steps to prevent the wrongful conduct as alleged in Doe's FAC.[4]

Poly further attempts to ignore the clear articulations of this culture in the FAC and deliberately mischaracterizes the facts set forth as mere "conclusory allegations." In doing so, Poly relies once again upon cases that are wholly distinguishable from the case at bar.[5] Here, the FAC paints a detailed picture of a culture at Poly which not only tolerated but actively protected known child abusers. FAC ¶¶ 11-18, 31. The FAC also expressly alleges that Poly "hired and/or retained Miller with knowledge of Miller's propensity for the type of behavior which resulted in Plaintiff's injuries." *Id.* ¶ 33. The FAC further alleges that Doe would not have been subjected to the abuse if Poly had taken reasonable care in supervising or retaining Miller, that Poly "knew or should have known of its employee Miller's propensity for the conduct that caused Plaintiff's injuries," and that Poly failed to properly supervise its employees. *Id.* ¶¶ 35-37. Tellingly, Poly does not suggest it did *anything* to ensure it was not employing pedophiles, and such a suggestion would furthermore be bereft of any shred of credibility in view of the decades of abuse and cover-up. In short, the FAC alleges that Poly either knew about Miller or failed to take basic steps to understand Miller's behavior and the risks that it presented. In either event, it is liable.

---

[4] Poly almost exclusively cites to cases involving isolated instances of abuse, where there was no reason for the defendant to be on notice of a problem. *See, e.g., Ghaffari v. North Rockland Cent. School Dist.*, 23 A.D.3d. 342 (2d Dep't 2005); *Ellin v. Best Buy Stores, L.P.*, No. 1:16-CV-8855 (ALC), 2018 WL 1281814, at *5 (S.D.N.Y. Mar. 7, 2018). These cases are fundamentally distinguishable from the case at hand. Doe has alleged here that the sexual assault and abuse of the minor children entrusted to Poly's care was utterly rampant, that it lasted for *decades* and involved *multiple* members of Poly's faculty and staff, and that Poly actively worked to ensure complete impunity for the child molesters on its payroll who were responsible for those heinous acts, all in the name of winning trophies.

[5] For example, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1989), is equally inapposite, because the case now at hand involves far more egregious behavior than complaints regarding a teacher's sexually inappropriate comments. Likewise, *Doe v. Rohan*, 17 A.D.3d 509 (2d Dep't 2005), involved allegations that a school bus driver had abused a student on his bus in the presence of one other student, but the sole "notice" was a complaint from the second student's mother that her daughter was being dropped off late. Here, Doe has alleged that the abuse occurred in a high-traffic area of the fully occupied school building in the middle of the school day. Both *A.B. v. Staropoli*, 929 F.Supp.2d 266 (S.D.N.Y. 2013) and *Koran I. v. New York City of Bd. of Educ.*, 256 A.D.2d 189, 191–92 (1st Dep't 1998) similarly involve alleged tortious conduct that occurred almost entirely outside of school hours and off school premises.

**B.  In Any Event, Constructive Notice is Not Required to Establish Poly's Liability**

While the FAC clearly alleges that Poly had constructive notice of the risk of harm to Doe and other students, constructive notice is not required to establish Poly's negligence. Although Poly seeks to couch its arguments in the law of employers and employees, the facts of this case do not permit nearly so neat an escape from liability. What Poly fails to grasp, and why its arguments ultimately therefore fail, is that this case is not merely or even primarily about the responsibility of an employer for the conduct of its employees; this case is about the duty that a school owes to the minor children who are entrusted into its custody and care, and its obligation to protect them from known and foreseeable harms, including sexual predators on its payroll. New York law places such cases in a different analytical framework; Doe need only show that the harm was foreseeable and the school failed to take appropriate measures to prevent it. This is amply set forth in the FAC.

As Poly notes in its submission, New York courts have indeed held that actual or constructive notice of prior similar conduct is "generally" required for purposes of establishing a negligence claim arising from the conduct of an employee. However, this is not the sole means by which liability for negligent supervision can be established. Rather, such liability can arise "even absent actual or constructive notice," where the "danger and risk of harm could have been reasonably foreseen and prevented by the institution." *Diamond Jewels v. Lewis*, No. 15-CV-5760, 2019 WL 5896224, at *23 (E.D.N.Y. Nov. 12, 2019). *See also Garcia v. City of New York*, 222 A.D.2d 192, 194 (1st Dep't 1996), *lv. denied* 89 N.Y.2d 808 (1997); *Murray v. Research Found.*, 184 Misc.2d at 457–58, *aff'd* 283 A.D.2d 995.

Because it is entrusted with the physical custody and care of minor children, a school is charged with a duty to act *in loco parentis*, and is thus obligated to provide adequate supervision and to protect the child from foreseeable harm. *Harmon v. Diocese of Albany*, N.Y. Slip Op. 50005(U), at *4 (Sup. Ct. Albany Cnty. 2021). This duty has been held to be "unqualified and

mandatory." *Coon by Fontana v. Bd. of Educ. of City of New York*, 160 A.D.2d 403, 403 (1st Dep't 1990) (reversing jury verdict where jury charge limited duty to protecting students "against dangers of which the Board had notice"). New York courts have repeatedly held that "*where the duty to supervise is mandatory, notice is not an issue.*" *Harmon*, N.Y. Slip Op. 50005(U), at *6 (internal citations omitted). Thus, although a plaintiff is generally required to demonstrate that a defendant had specific knowledge or notice of prior dangerous conduct, "if the potential danger to the child can be reasonably foreseen and prevented by adequate supervision, then the child's custodian may be held liable for his assault, notwithstanding the fact that it lacked actual or constructive notice of prior dangerous conduct by the alleged assailant." *Id*. at *6. New York courts have furthermore held that "a school's duty to supervise encompasses teachers as well as students, to the extent that teachers may potentially abuse students." *T.Z. v. City of New York*, 635 F.Supp.2d 152, 185 (E.D.N.Y. 2009), *rev'd in part on reconsideration on other grounds,* 634 F.Supp.2d 263 (E.D.N.Y. 2009) (first citing *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F.Supp.2d 387, 402 (E.D.N.Y. 2005); then citing *Doe v. Whitney*, 8 A.D.3d at 612).

In *Garcia*, 222 A.D.2d at 196, the First Department held that the defendant-school could properly be deemed to have acted negligently despite lacking notice of previous similar conduct by the assailant. In that case, a minor student was sexually assaulted by another student in the school restroom. *Id.* at 193. The defendant-school argued that "because the school had no notice of any similar incidents or of any prior dangerous conduct by the alleged assailant, the complaint must be dismissed," but the Appellate Division flatly rejected this contention. *Id.* at 195. Citing the school's obligation to act *in loco parentis* and its knowledge that such an assault could occur, the court held that the risk was foreseeable and that the school could properly be held liable for negligent supervision, despite the lack of notice of similar previous misconduct by the assailant.

*Id.* at 196–97. *See also Phillips ex rel. Green v. City of New York*, 453 F.Supp.2d 690, 732 (S.D.N.Y. 2006) ("specific knowledge" does not require that the defendant had prior notice that the particular assailant had exhibited prior similar conduct).

The fact of sexual abuse at Poly was well-known, as was Poly's obdurate unwillingness to address it in any constructive way. The FAC sets forth details of the culture of sexual abuse of students that pervaded Poly during Doe's time as a student. Poly made it known that abusers would be protected, and victims would face shunning and expulsion should they choose to come forward. Not only was there a culture of abuse, but there was such a lack of adequate supervision, that Miller was able to repeatedly assault Doe over the course of several years, in an open classroom without ever being discovered or, if discovered, any reports or actions taken. The abuse was hiding in plain sight, but no one would even bothered to find out where Doe was, or why he was alone with Miller in the classroom after class ended instead of where he was supposed to be. The risk of harm was obvious but it was deliberately ignored by Poly, again and again. *See, e.g.*, *Garcia*, 222 A.D.2d at 195–96 (failure to follow school policy to protect students from harm made risk of harm reasonably foreseeable despite lack of specific knowledge of prior similar conduct by assailant); *Harmon*, 2021 N.Y. Slip Op. 50005(U), *4 (discovery regarding priests charged with abuse in same parish was relevant to whether risk of harm was reasonably foreseeable). It is therefore immaterial whether Poly had notice of Miller's propensity to sexually abuse students, as the risk of harm to Doe was reasonably foreseeable based on the facts alleged in the FAC.

## III.   THE FIRST AMENDED COMPLAINT SUFFICIENTLY STATES A CLAIM FOR BREACH OF DUTY *IN LOCO PARENTIS* AND BREACH OF FIDUCIARY DUTY

### A.  The First Amended Complaint Adequately States Poly's Breach of its Duty to Act *in loco parentis* by Failing to Properly Supervise Doe

As explained above, a school is charged with a duty to act *in loco parentis*, which includes the duty to provide adequate supervision to students and to protect the children in their care from foreseeable harm. *Harmon*, N.Y. Slip Op. 50005(U) *4. Poly's failure to provide adequate supervision to Doe in the manner that a reasonable parent would in the circumstances at the time was a breach of this duty, and the facts supporting as much as clearly set forth in the FAC.

Under New York law, a school stands *in loco parentis* with respect to each and every minor student in its custody and care. *See Ferguson v. City of New York*, 118 A.D.3d 849, 849–50 (2d Dep't 2014) (explaining that a school district "may not be held liable for the negligent performance of its governmental function of supervising children in its charge, at least in the absence of a special duty to the person injured," but "[u]nder the doctrine that a school district acts in loco parentis with respect to its minor students, a school district owes a "special duty" to the students themselves") (citing *Dinardo v. City of New York*, 13 N.Y.3d 872, 874 (2009)). Thus, despite Defendant's equivocation on this point, it is a matter of law in New York that a school "owes a 'special duty' to the students themselves," and can be held liable for the breach of that duty. *Id.*, citing *Pratt v. Robinson*, 39 N.Y.2d 554, 560 (1976).[6]  New York courts have further held that "a school's duty to supervise encompasses teachers as well as students, to the extent that teachers may potentially abuse students." *T.Z. v. City of New York*, 635 F.Supp.2d at 185 (first citing *Tesoriero,* 382 F.Supp.2d at 402; then citing *Doe v. Whitney,* 8 A.D.3d at 612).

"The standard for determining whether the school has breached its duty is to compare the school's supervision and protection to that of a parent of ordinary prudence placed in the same situation and armed with the same information." *Deb B. v. Longwood Cent. Sch. Dist.*, 165 A.D.3d

---

[6] *See also Mirand v. City of New York*, 84 N.Y.2d 44, 49 (1994) (explaining that schools may be held liable for a breach of this duty, and that "[t]he duty owed derives from the simple fact that a school, in assuming physical custody and control over its students, effectively takes the place of parents and guardians"); *Stinson v. Roosevelt U.F.S.D.*, 61 A.D.3d 847, 847–48 (2d Dep't 2009) (same).

1212, 1213 (2d Dep't 2018) (first citing *Timothy Mc. v. Beacon City Sch. Dist.*, 127 A.D.3d 826

(2d Dep't 2015), then citing *David v. County of Suffolk*, 1 N.Y.3d 525, 526 (2003)). Where a

complaint alleges a history of assaults on students, this Court has held that "a reasonable fact finder

could find that a 'reasonably prudent parent' would invariably have supervised [ ] more closely."

*T.Z.*, 635 F.Supp.2d at 185 (quoting *Mirand,* 84 N.Y.2d at 49). New York courts have further held

that a factfinder could reasonably conclude that a school negligently failed to supervise a sexually-

abusive teacher, where the teacher engaged in conduct such as keeping a student in his classroom

outside of scheduled class times and meeting with a student behind closed doors in violation of

school policy. *See Tesoriero,* 382 F.Supp.2d at 402 (citing *Murray*, 723 N.Y.S.2d at 807)) (denying

defendant-school's motion for summary judgment); *Deb B.*, 165 A.D.3d at 1213 (considering

additional factors such as a particular student's history of leaving the school building at improper

times and being at locations other than where she was expected during the school day).

Doe asserts that Poly breached its duty to act *in loco parentis* by failing to provide adequate

supervision of its students despite knowing that students were regularly being subjected to sexual

abuse on campus by Poly's own employees. FAC ¶ 51. Doe further alleges that Poly's actions were

willful, wanton, malicious, reckless, negligent, grossly negligent and/or outrageous in their evident

disregard for Doe's rights and safety as a student. *Id.* ¶ 52. Poly does not even try to argue that it

provided any supervision, let alone adequate supervision, nor does it assert that it did not know

sexual abuse was occurring. Instead, Poly only makes the irrelevant argument that Doe failed to

allege that it specifically knew about Miller. Poly's failure to take any steps whatsoever to protect

students from known sexual abuse by members of its staff was a gross deviation from Poly's duty

to act *in loco parentis* with respect to the minor students entrusted to its custody and care.

Certainly, and thankfully, no "parent of ordinary prudence" apprised of the rampant child sexual abuse at Poly would deem Poly's failure to act reasonable. No reasonable parent would send their child to school every day hoping that he was not the next victim of such predators. No parent would knowingly tolerate such abuse and thereby allow other would-be abusers to feel emboldened as well. The FAC thus sufficiently states a cause of action arising from Poly's failure to act *in loco parentis* vis-à-vis its failure to provide any adequate or meaningful supervision of its students despite knowing they were being sexually abused by Poly's own faculty and staff.[7]

### B. The First Amended Complaint Further Establishes Poly's Breach of the Fiduciary Duty Owed to its Students

Poly argues that Doe has failed to state a claim for breach of fiduciary duty because schools do not owe a fiduciary duty to students in their care. This argument ignores the nature of the relationship between a minor student and the school to whom he is entrusted each day. Under New York law, such institutions "are charged with the highest degree of care," and must exercise "more vigilance than would be required for adults." *Willis v. YMCA of Amsterdam*, 28 N.Y.2d 375, 379 (1971). *See also Charles v. Village of Mohawk*, 128 A.D.3d 1477, 1478 (4th Dep't 2015), *quoting Cruz v. New York City Tr. Auth.*, 136 A.D.2d 196, 201 (2d Dep't 1988); and *Cesar Ivan A. v. Lolita Child Day Care*, 98 A.D.3d 697 (2d Dep't 2012) ("Certainly, a person to whom a child is entrusted by their parent has a special duty to adequately supervise that child.").

The nature of this relationship between a school and the children entrusted to its care fits squarely within the definition of a fiduciary relationship under New York law, which is functional rather than mechanical, and defines such a relationship as one that is "founded upon trust or

---

[7] To the extent that the Court finds that Doe has failed to state a cognizable claim for breach of duty *in loco parentis*, Poly respectfully requests that the court instead review this portion of Doe's allegations as an extension of Doe's claim for negligent supervision. *See T.Z. v. City of New York*, 635 F.Supp.2d at 185 (noting that "a school's duty to supervise encompasses teachers as well as students, to the extent that teachers may potentially abuse students"), *rev'd in part on reconsideration on other grounds*, 634 F.Supp.2d 263.

confidence reposed by one person in the integrity and fidelity of another." *Penato v. George*, 52 A.D.2d 939, 942 (2d Dep't 1976). More specifically, "[i]t is said that the relationship exists *in all cases* in which influence is acquired and abused, in which confidence has been reposed and betrayed." *Id.* (emphasis added). The fiduciary relationship is not limited to trust in the supervision of financial or other tangible assets of another. Despite Poly's grotesque assertion that students are not entitled to rely on the integrity of the school and its teachers to protect them from sexual predation, the fact is that such relationships are not just about money, and it is hard to conceive of a relationship of greater trust reposed, and betrayed, than between a child and a school that deliberately fails to protect him from being sexually abused.

Not only does Poly wrongly assert that no fiduciary relationship ever exists between a school and a student,[8] *see* Def. Br. at 14, Poly then attempts to support its flawed argument with cases that, with a single exception, do not in any way involve the relationship between schools and minor children entrusted to their custody and care or sexual assault.[9] Poly seeks to interpose irrelevant cases involving law schools or technical adult education where students failed to get what they paid for. Doe is not a law student unhappy with his educational experience; he was a child, who trusted Poly to act in his best interests to protect him and was betrayed. This unique

---

[8] *Zimmerman v. Poly Prep Country Day Sch.*, 888 F.Supp.2d 317 (E.D.N.Y. 2012), the sole case cited by Poly which involves minor students, involved a RICO action against Poly that alleged Poly's decades long cover-up of abuse of numerous children. That case simply refers to the nomenclature used to describe such claims, and elects to refer to breach of fiduciary duty claims raised along with the negligent hiring and retention claims under the overall rubric of "negligence claims." *Id.* at 335 n.5. The court does not find that schools do not owe fiduciary duties to their minor students, and in fact the court's subsequent analysis turns in part on the fact that any fiduciary relationship of trust would have terminated when the students reached the age of majority; thus it does not reject the fiduciary relationship but finds it time-limited. *Id.* It strongly suggests that the relationship does exist between school and student as long as the student was a minor at the time.

[9] See Def. Br. at 14–15, citing *Gomez-Jimenez v. New York Law School*, 103 A.D.3d 13, 19 (1st Dep't 2012) (involving tuition-paying adult law student attending defendant law school, holding, "A fiduciary relationship does not exist between parties engaged in an arm's length business transaction"); *Bevelacqua v. Brooklyn Law School*, No. 500175/2012, 2013 WL 4082674, at *14 (Sup. Ct. Kings Cty. Apr. 22, 2013) ("[T]he relationship between an institution of higher learning and its students is contractual, rather than fiduciary in nature."); *Moy v. Adelphi Institute, Inc.*, 866 F.Supp. 696, 707–08 (E.D.N.Y. 1994) (allegations of trust and confidence placed in vocational school by adult student described a business not fiduciary relationship).

nature of the relationship fits within the parameters of a fiduciary relationship, and despite Poly's assertions, it has failed to provide any legal authority which contradicts this proposition.

Finally, although Poly asserts that a claim of sexual abuse against a child does not fall within the protections afforded by a fiduciary relationship (Def. Br. at 15), this contention mischaracterizes Doe's allegations regarding fiduciary responsibility. Specifically, Doe asserts that Poly "assumed a duty to act in [Doe's] best interests." FAC ¶ 60. The claimed breach is not premised on *respondeat superior* responsibility for the sexual abuse perpetrated by Miller, but rather on Poly's own failure as an institution to act with integrity and trustworthiness in Doe's best interests to take steps to protect him (and others) from sexual abuse.

## IV.   THE FIRST AMENDED COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR INADEQUATE SECURITY AND FOR BREACH OF POLY'S NON-DELEGABLE DUTY

Poly's motion to dismiss Doe's claims for inadequate security and breach of non-delegable duty is similarly without merit and must be denied. As the owner and entity in control of the school premises where the majority of Doe's abuse occurred, Poly had a duty to protect Doe and others from foreseeable harm on campus. This duty includes protection from the criminal conduct of third parties, including Poly employees. Doe alleges that, despite knowing that children were being sexually abused on campus, Poly did nothing to investigate, remediate, or otherwise address the criminal conduct. Accordingly, the FAC states a claim for inadequate security and breach of non-delegable duty, and the motion to dismiss these claims should be denied.

Poly had a duty as the owner of the premises to protect Doe and his fellow students from foreseeable harm, and this duty included harm that may be caused by an employee. *See PB-36 Doe v. Niagara Falls City Sch. Dist.*, No. E172556/2020, 2021 WL 3044998, at *2 (N.Y. Sup. Ct. Niagara Cnty. July 19, 2021) (first citing *Taft v. Connell*, 285 A.D.2d 992, 992 (4th Dep't 2001) (holding that "it is the duty of a property owner to protect plaintiff from foreseeable harm caused

by third persons"); then citing *JG v. Goldfinger*, 161 A.D.3d 640, 640 (1st Dep't 2018) (explaining that "[t]his doctrine has been applied not only in cases where the assailant was a stranger to the defendant, but also, as in the case here, where the underlying act was committed by an employee of the establishment")). This obligation includes the duty to take reasonable precautions to protect against foreseeable criminal conduct, *see Irons v. Inst. for Cmty. Living, Inc.*, No. 17-CV-7052, 2019 WL 121675, at *2 (E.D.N.Y. Jan. 7, 2019) (citing *Karim v. 89th Jamaica Realty Co., L.P.*, 127 A.D.3d 1030, 1030 (2d Dep't 2015)), and the specific safety precaution required "is almost always a question of fact for the jury." *Ortiz v. New York City Hous. Auth.*, 22 F.Supp.2d 15, 20 (E.D.N.Y. 1998), *aff'd*, 198 F.3d 234 (2d Cir. 1999) (citing *Nallan v. Helmsley–Spear, Inc.,* 50 N.Y.2d 507, 520 n.8 (1980)). *See also Sawyer v. Wight,* 196 F.Supp.2d 220, 226–27 (E.D.N.Y. 2002) (denying defendant's motion for summary judgment despite defendant having provided security, holding that only a jury could determine whether such measures were adequate).

Foreseeability of such criminal conduct has been found in cases in which there was a "prior occurrence of the same or similar criminal activity in a location sufficiently proximate to the subject location." *Irons*, 2019 WL 121675 at *2 (citing *Karim*, 127 A.D.3d at 1030). *See also Jacqueline S. by Ludovina S. v. City of New York*, 81 N.Y.2d 288, 294 (1993) (casting foreseeability as "past experience that there is a likelihood of conduct on the part of third persons" that is likely to create a risk of harm). *Kahane v. Marriott Hotel Corp.,* 249 A.D.2d 164, 165 (1st Dep't 1998) (reversing trial court decision granting summary judgment in favor of defendant and reinstating plaintiff's complaint, concluding that "[c]learly, whether a risk is foreseeable under a specific set of circumstances is generally a question best left to a trier of fact") (citing *Rotz v. City of New York,* 143 A.D.2d 301 (1st Dep't 1988)).

Critically, foreseeability does not require that the past experience of criminal activity have occurred in the exact same location or even that it be exactly the same type of criminal conduct. *Jacqueline S.*, 81 N.Y.2d at 294–95 (citing *Miller,* 62 N.Y.2d at 509) (noting that in *Miller*, the Court held that the occurrence of criminal activity at issue in that case was held to be "foreseeable, in part, because of different criminal conduct occurring" elsewhere on campus). Rather, foreseeability of criminal conduct is highly fact specific and "must depend on the location, nature and extent of those previous criminal activities and their similarity, proximity or other relationship to the crime in question." *Id.* (citing *Keenan v. Dayton Beach Park No. 1 Corp.*, 175 A.D.2d 862 (2d Dep't 1991)) (holding triable issue of fact existed as to whether criminal conduct which caused plaintiff's injuries was foreseeable to defendant as a result of prior similar criminal conduct on property). New York courts have not hesitated to find that landowners and parties in control of property can be held liable for failing to exercise reasonable care to prevent sexual assaults from occurring on their premises. *See Kukla v. Syfus Leasing Corp.,* 928 F.Supp. 1328, 1334–35 (S.D.N.Y. 1996) (collecting cases affirming liability based on history of previous crimes at or near the location in question, citing *Splawn v. Lextaj Corp.,* 197 A.D.2d 479 (1st Dep't 1993) (affirming jury verdict against owner in favor of woman who was raped in her hotel room by a stranger), *Pantages v. L.G. Airport Hotel Assoc., Inc.,* 187 A.D.2d 273 (1st Dep't 1992), and *Garzilli v. Howard Johnson's Motor Lodges, Inc.,* 419 F.Supp. 1210 (E.D.N.Y. 1976) (same)).

Despite Poly's faux consternation at being required to act as an "absolute insurer" of students' safety, the reality is that the duty to take reasonable preventative measures to prevent the re-occurrence of crime that has already occurred on campus is an obligation that is imposed by the law of New York. It is this duty that Poly breached by failing to undertake any measures whatsoever to ensure the safety of its students from sexual predators on campus, despite knowing

such predators were actively preying on students. In short, Poly had an obligation to maintain a safe premises for the students entrusted to its care. This obligation included the duty to protect Doe from foreseeable criminal conduct, including by a Poly employee. The sexual abuse of Doe by Miller was entirely foreseeable to Poly, since it was aware of numerous other allegations of similar such conduct occurring on campus. Despite these allegations and Poly's knowledge of similar criminal acts on its premises, Poly did *nothing* to attempt to protect Doe or any of the other untold number of students who suffered similar fates. It did not provide security or undertake any other efforts to keep students safe from this obvious harm. Accordingly, the FAC sufficiently alleges that Poly breached its duty to maintain a safe premises and provide adequate security to protect Doe and other students from the foreseeable risk of ongoing criminal conduct occurring on campus.

Defendant's motion to dismiss the Plaintiff's claim for breach of non-delegable duty is likewise without legal support. As the entity in sole custody and control of the school premises, Poly had a non-delegable duty to maintain the school premises in safe conditions. *See Conte v. Servisair/Globeground*, 63 A.D.3d 981, 981 (2d Dep't 2009); *Brenner v. Johnson Controls, Inc.*, 277 A.D.2d 412, 413 (2d Dep't 2000); *Sprung v. Command Sec. Corp.*, 38 A.D.3d 478, 479 (1st Dep't 2007); *Rahim v. Sottile Sec.* Co., 32 A.D.3d 77, 80 (1st Dep't 2006). Maintaining premises in safe conditions does not simply mean fixing broken blackboards in the classroom; it means making reasonable efforts to prevent boys from being sexually assaulted at school when there is a known risk of such abuse. The failure to maintain the premises in a secure fashion to prevent the sexual abuse experienced by Doe and others was a breach of this duty, for which Poly may accordingly be held liable.[10]

---

[10] For purposes of a motion to dismiss, "[t]he fact that a cause of action is not expressly denominated is not fatal if the factual allegations in the complaint fit within a cause of action." *Scollar v. City of New York*, 160 A.D.3d 140, 144–45 (1st Dep't 2018) (citations omitted); *Wayne S. v Nassau County, Dept. of Social Services*, 83 A.D.2d 628 (2d Dep't 1981) ("If the pleading states a cause of action and if, from its four corners, the factual allegations, taken together,

## V.     THE FIRST AMENDED COMPLAINT ADEQUATELY STATES CLAIMS FOR INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### A.     Poly's willful and continued facilitation, tolerance, and coverup of rampant sexual abuse of minor students for decades by Poly staff constituted conduct "beyond all possible bounds of decency."

Doe has sufficiently stated claims for intentional and negligent infliction of emotional distress. To prevail on this motion, Doe needs to show that the FAC alleges: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress. *Howell*, 81 N.Y.2d at 121. The conduct must "consist of more than mere insults, indignities and annoyances," and arise "as a result of a "campaign of harassment or intimidation." *164 Mulberry St. Corp. v. Columbia Univ.*, 4 A.D.3d 49, 56 (1st Dep't 2004). These torts "do not proscribe specific conduct," but rather "[t]he tort is as limitless as the human capacity for cruelty." *Id*. This and other cases against Poly explore the bounds of that terrible "capacity for cruelty."

In this case, Poly's failure to address or undertake any remedial measure whatsoever after learning of the horrific sexual abuse being perpetrated against students easily meets the standard of outrageous conduct beyond all bounds of decency. In *Pinks v. Turnbull*, 25 Misc.3d 1245(A) (Sup. Ct. 2009), a case cited by Poly, the court denied a motion to dismiss a claim for intentional infliction of emotional distress finding that failure to protect a child from sexual abuse once it had notice constitutes "conduct . . . so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"), quoting *Murphy v. Home Prod. Corp.,* 58 N.Y.2d 293, 303 (1983). Thus,

---

manifest any cause of action cognizable at law, a motion for dismissal will fail"). The issue is whether or not the proponent of a pleading in fact *has* a cause of action based on the facts alleged. *Leon v. Martinez*, 84 N.Y.2d 83, 88 (1994) (citing *Guggenheimer v. Ginzburg*, 43 N.Y.2d 268, 275 (1977). The facts alleged here state a cause of action for Poly's negligence under multiple rubrics. Poly's hyper-technical protestations that New York does not recognize a separate cause of action for these claims are invalid and irrelevant.

Plaintiff's allegations of Poly's toleration of sexual abuse and failure to take any steps to prevent Doe or others from being victimized sufficiently alleges outrageous conduct, and Poly's motion to dismiss this count should be denied.

### B. Poly deliberately ignores factual allegations detailing the physical manifestations of severe emotional distress in Doe's First Amended Complaint.

New York law entitles a Plaintiff who has suffered like Doe to recover for his injuries. Despite Defendant's protestations regarding a requirement of manifestation of physical injury, in fact, "[t]he first element—outrageous conduct–serves the dual function of filtering out petty and trivial complaints that do not belong in court and assuring that plaintiff's claim of severe emotional distress is genuine." *Howell*, 81 N.Y.2d at 121. Physical injury is not required; the injury alleged here is both severe and genuine.

As noted above, Doe's allegations regarding Poly's failure to address or take any protective measure to safeguard students in the face of ongoing abuse is more than sufficiently outrageous conduct. It provides the Court the necessary assurances that Doe's claim of severe distress is genuine and sufficient to state a cause of action. Moreover, Doe has further expressly alleged the that as a direct result of Poly's outrageous conduct, he has suffered psychological injuries, resulting in tangible harm, including difficulties sustaining a career, and financial and professional difficulties as well. FAC ¶¶ 30, 83–86. Thus, Poly's argument on this point is without merit and its motion to dismiss this count should be denied.

## VI.    DOE'S CLAIMS ARE NOT IMPERMISSIBLY DUPLICATIVE

Poly seeks dismissal of Doe's second, third, fourth, fifth, eighth, and ninth causes of action by arguing that they are based on the same factual allegations and seek the same relief as Plaintiff's cause of action for negligent hiring, supervision and retention of Miller.[11] Poly's argument mischaracterizes the nature of Doe's claims as set forth in the FAC.

Rule 8 of the Federal Rules of Civil Procedure states, in pertinent part, that:

A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.

Fed. R. Civ. P. 8(e)(2). *See also Aiena v. Olsen,* 69 F.Supp.2d 521, 531 (S.D.N.Y. 1999) (permitting alternative pleading for ERISA claim made in the alternative to state law claims because plaintiff not bound by alternative allegations at motion to dismiss stage).

Moreover, Poly has, in this same pleading, sought dismissal of Doe's first cause of action—the very claim which, according to Poly, renders each of the other causes of action listed immediately above duplicative. Def. Br. at 20. Thus, it follows that any determination as to whether the above causes of actions must be dismissed as duplicative would be premature at best, until this Court has had the opportunity to review and determine Defendant's motion to dismiss Doe's first cause of action. *See R.B. Dev., Co., Ltd. v. Tutis Capital LLC,* No. 12CV01460CBASMG, 2013 WL 12358006, at *19 (E.D.N.Y. Sept. 27, 2013) (denying motion to dismiss duplicative contract and unjust enrichment claims as premature at the pleading stage). While it may be that the damages

---

[11] Doe recognizes that his claims of abuse parse into multiple claims, some of which may overlap with respect to damages. There is no reason or obligation, however, for Doe to pick and choose which claims should remain at this stage of the proceedings, as long as the claims are tenable under New York law, which they are as argued above, and the jury is properly instructed on non-duplication of damages.

for certain claims that sound in negligence overlap and can only be recovered once, that does not preclude alternative causes of action or theories of recovery. The claims are analytically distinct, even if there is a common nucleus of operative facts.

Even if the Court took the view that the negligence-based claims should be consolidated into fewer claims, the claims that sound in negligence are plainly separate from the intentional tort of intentional infliction of emotional distress, addressing different types of misconduct. A negligence claim requires the plaintiff to establish a duty, which was breached, causing injury. The tort of intentional infliction of emotional distress, by contrast, has different elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress. *Howell*, 81 N.Y.2d at 121 (1993). *Howell* explained the uniqueness of claims for intentional infliction of emotional distress, which do not require proving the existence of any pre-established legal duty:

> Unlike other intentional torts, intentional infliction of emotional distress does not proscribe specific conduct, but imposes liability based on after-the-fact judgments about the actor's behavior. Accordingly, the broadly defined standard of liability is a both a virtue and a vice. The tort is as limitless as the human capacity for cruelty. The price for this flexibility in redressing utterly reprehensible behavior however, is a tort that, by its terms, may overlap other areas of the law, with potential liability for conduct that is otherwise lawful. Moreover, unlike other torts, the actor may not have notice of the precise conduct proscribed.

*Id.* at 122. Courts have allowed claims for intentional infliction of emotional distress to proceed in cases where the plaintiff alleges an institution negligently allowed an employee to sexually abuse a child. *See, e.g., Pinks*, 25 Misc.3d 1245(A) (refusing to dismiss claim of intentional infliction of emotional distress against Boys Choir of Harlem for sexual abuse by employee when alleged defendant, after notice, did nothing to protect plaintiff).

32

Thus, Poly's motion to dismiss on grounds of duplicative claims is at best premature, tries to conflate distinct causes of action, and fails to distinguish between intentional and unintentional torts. It should be denied.

## VII. POLY IS LIABLE FOR THE ASSAULT AND BATTERY COMMITTED BY ITS EMPLOYEE

Poly's contention that it cannot be held liable for the assault and battery perpetrated by its employee against a minor child is also without legal basis. Courts will not hesitate to hold employers vicariously liable for torts, including intentional torts, committed by employees acting within the scope of their employment. *Rivera v. State*, 34 N.Y.3d 383, 389–91 (2019) (citing *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999)); *Riviello v. Waldron*, 47 N.Y.2d 297, 304 (1979); *Jones v. State of New York*, 33 N.Y.2d 275 (1973). In *Riviello*, 47 N.Y.2d at 302, the Court of Appeals noted that long ago, "when employers could exercise close control" over employees "during their period of service," the term "scope of employment" was defined narrowly. However, "social policy has wrought a measure of relaxation of the traditional confines of the doctrine." *Id.* The test—properly stated—is "whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." *Id.* (internal quotation omitted). And, as the Court of Appeals stated, "because the determination of whether a particular act was within the scope of the servant's employment is so heavily dependent on factual considerations, the question is ordinarily one for the jury. *Id.* at 303.

The guidance of *Rivera* and its progeny require rejection of Poly's motion on the assault and battery counts. Poly is a school, and as such it has a duty to it students when they are on the premises. *See Ferguson*, 118 A.D.3d at 850. And while a school may not be liable for *unforeseen* accidents, injuries, or harm to students (*see Mathis v. Board of Educ. of City of N.Y.*, 126 A.D.3d 951, 953 (2d Dep't 2015)), the prospect of sexual assault by a faculty member of a student is

33

foreseeable, particularly given Poly's history of such incidents. This is not a case of a postal scale falling on poor Mrs. Palsgraf; it is entirely within the zone of foreseeable harm. The FAC alleges that Poly knew it had a problem with sexual assaults, and not only failed to remediate this problem but in fact exacerbated it. In this scenario, a jury must determine if the school "could reasonably have anticipated" a teacher abusing the teacher-student relationship to prey on students.

In this case, the facts as alleged in the FAC weigh heavily in favor of the conclusion that Miller was acting within the scope of his employment when he committed assault and battery in his classroom directly after class. All but one of the acts occurred in this way (FAC ¶¶ 22–24), and the other occurred because Doe was at Miller's apartment to seek and obtain a letter of recommendation from the only teacher who was willing to provide one. *Id.* ¶¶ 26, 27. Moreover, Miller used his position as a teacher, his praise, his giving of high grades, his agreement to write a letter of recommendation, his suggestion that his activities were biblically sanctioned (when he taught Doe the Bible), and beautiful (when he taught Aesthetics), to interweave his professional activities with sexual assault and create the confusion, anxiety and shame described in the FAC. Miller was grooming Doe in a manner that may not have been apparent to a child, but certainly would have been apparent to his colleagues at Poly. The general knowledge of its toleration by teachers in a position of authority over students further supports the conclusion that assaults were not outside the scope of employment at Poly. *Id.* ¶¶ 11–18. Sexual abuse was a feature, not a bug, of the system at Poly. *See also Sherman v. State Department of Public Safety*, 190 A.3d 148 (Del. 2018) (holding employer liable for sexual misconduct of officers against arrestee since tort committed was foreseeable and relied on the officer's position authority); *Kelleher v. F.M.E. Auto Leasing Corp.*, 192 A.D.2d 581, 585 (2d Dep't 1993) (employer can be held liable for punitive

damages if plaintiff established the employer's complicity in the wrongdoing or ratification of the conduct of its employee).

Accordingly, Poly can be held liable for the assault and battery perpetrated by its employee against Doe. The cases cited by Poly to the contrary are once again inapposite, as none involve schools entrusted with the safety and care of minor students, nor do they involve allegations that a school not only failed to ensure a safe environment, but actively protected perpetrators of similar conduct in previous similar incidents. This is wholly distinguishable from a case where a defendant-employer simply hired someone who later engaged in assault and battery.

<u>**CONCLUSION**</u>

For the reasons set forth above, Plaintiff respectfully request that the Court deny Poly's motion for dismissal.

Dated: September 13, 2021
   New York, New York

Respectfully submitted,

**LEWIS BAACH KAUFMANN MIDDLEMISS PLLC**

BY:   */s/ Jason H. Berland*
      Jason H. Berland
      Diane M. Camacho
      The Chrysler Building
      405 Lexington Avenue, 64th Floor
      New York, NY 10174
      Tel: (212) 826-7001
      Fax: (212) 826-7146
      jason.berland@lbkmlaw.com
      diane.camacho@lbkmlaw.com

      *Counsel for Plaintiff John Doe*